John H. BANKS, et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 99–4451 L.

United States Court of Federal Claims.

May 4, 2010.

John B. Ehret, Stevensville, MI, for certain plaintiffs in No. 99–4451L, Mark E. Christensen, Chicago, IL, for certain plaintiffs in No. 99–4451L. Eugene J. Frett, Chicago, IL, pro se in No. 05–1353L.

Terry M. Petrie and Mark S. Barron, Natural Resources Section, Denver, CO, with whom was Ignacia S. Moreno, Assistant Attorney General, Environment and Natural Resources Division, United States Department of Justice, Washington, DC, for defendant. Gary W. Segrest and Don C. Erwin, Office of Counsel, United States Army Corps of Engineers, Detroit, MI, of counsel.

## OPINION

HEWITT, Chief Judge.

Before the court are Plaintiffs' Motion to Strike Defendant's Expert, Dr. Jesse McNinch (Pls.' McNinch Mot. or McNinch Motion) filed January 12, 2010, Docket Number (Dkt. No.) 381; United States' Response in Opposition to Plaintiffs' Motion to Strike United States' Expert, Dr. Jesse McNinch (Def.'s Resp. McNinch Mot.) filed February 9, 2010, Dkt. No. 391; and Plaintiffs' Reply in Support of Their Motion to Strike Defendant's Expert, Dr. Jesse McNinch (Pls.' Reply McNinch Mot.) filed February 19, 2010, Dkt. No. 393. Also before the court are Plaintiffs' Motion to Strike Defendant's Expert, Dr. Robert Nairn (Pls.' Nairn Mot. or Nairn Motion) filed January 22, 2010, Dkt. No. 384; United States' Response in Opposition to Plaintiffs Motion to Strike United States' Expert, Dr. Robert Nairn (Def.'s Resp. Nairn Mot.) filed February 16, 2010, Dkt. No. 392; and Plaintiffs' Reply in Support of Their Motion to Strike Defendant's Expert, Dr. Robert Nairn (Pls.' Reply Nairn Mot.) filed February 26, 2010, Dkt. No. 394. The McNinch Motion and the Nairn Motion are collectively referred to as the Motions. For the reasons stated below, plaintiffs' Motions are DENIED.

## I. Background

Plaintiffs are several dozen owners of property in Michigan "along a four and one-half mile stretch of the eastern shoreline of Lake Michigan south of St. Joseph[ ] Harbor." *Banks v. United States (Banks II)*, 314 F.3d 1304, 1306 (Fed.Cir.2003). Plaintiffs allege that the United States Army Corps of Engineers (Corps), by its construction and maintenance of certain jetties at St. Joseph Harbor, "ha[s] interfered with the natural littoral flow of sand and river sediment and caused damage to the lakebed," which has effected "a gradual and continued taking" of plaintiffs' shoreline property. *Id.*

The activities of the Corps affecting St. Joseph Harbor and the eastern shoreline began in the 1830s. *Id.* In 1903, the Corps completed construction of the St. Joseph Harbor jetties. *Id.* "Between 1950 and 1989, the Corps installed sandtight steel sheet piling to the jetties." [1] *Id.* The parties agree that the harbor jetties exacerbate the naturally occurring erosion of the shorelines along the Great Lakes. *Id.* The jetties in St. Joseph Harbor have " 'significantly increased the annual rate of shoreline erosion,' which, without human intervention, occurs naturally at a rate of approximately one foot per year." *Id.* (quoting *Banks v. United States (Banks I)*, 49 Fed.Cl. 806, 815–16 (2001)). Since the mid–1970s the Corps has " 'acknowledged the longstanding and significant exacerbation of erosion caused by its harbor jetties.' " *Id.* (quoting *Banks I*, 49 Fed.Cl. at 817). On summary judgment, the court determined that the claims were time-barred. *Banks I*, 49 Fed.Cl. at 825–26. On appeal of the determination that plaintiffs' claims were time-barred, the United States Court of Appeals for the Federal Circuit (Federal Circuit) held that "[w]ith the mitigation efforts underway, the accrual of plaintiffs' claims remained uncertain until the Corps' 1996 Report, 1997 Report, and 1999 Report collectively indicated that [the shoreline] erosion was permanent and irreversible." *Banks II*, 314 F.3d at 1310. The Federal Circuit therefore concluded that, because "[t]he statute of limitations did not begin to run until the Corps issued the 1996, 1997, and 1999 Reports," plaintiffs' complaints were timely. *Id.*

Pursuant to Section 111 of the River and Harbor Act of 1968, Pub.L. No. 90–483, 82

---

1. "[S]andtight steel sheet piling" describes construction which blocks the flow of sand through the jetty. *See Banks v. United States (Banks II)*, 314 F.3d 1304, 1306 (Fed.Cir.2003) (describing the sandtight steel sheet piling jetties in St. Joseph Harbor as having "interfered with the natural littoral flow of sand and river sediment").

Stat. 731, 735 (1970),[2] the Corps prepared a proposal in 1974 to mitigate the shoreline erosion attributable to the jetties in St. Joseph Harbor. *Banks II*, 314 F.3d at 1306. The Corps' mitigation efforts included: more than fifteen years of providing fine sand for "feeder beaches 'to nourish the areas suffering shore damage,'" depositing coarser sediment material with longer retention time on the St. Joseph Harbor shoreline at least five times between 1986 and 1993, and "placing barge-loads of large rocks into the lake in 1995." *Id.* at 1306–07. Three technical reports prepared by the Corps and issued in 1996, 1997, and 1999 respectively, addressed the progress of the Corps' mitigation efforts and "collectively indicate[d] that the [shoreline] erosion was permanent and irreversible." *Id.* at 1307.

After the trial on liability in 2007, the court concluded that the Corps had provided effective mitigation to portions of the affected shoreline that were sandy in composition but that the Corps' mitigation efforts were ineffective as to the shores with "cohesive" composition. *See Banks v. United States (Banks V)*, 78 Fed.Cl. 603, 656 (2007). The court noted that, although "plaintiffs failed to prove by a preponderance of the credible evidence that plaintiffs' properties are located on a cohesive lake bottom[,] . . . [t]he trial [on liability] did not focus on [plaintiffs'] particular properties." *Id.* at 628. The court stated that, as to particular plaintiffs, "[i]f, in further proceedings, some or all of the plaintiff's property is determined to lie in the . . . zone characterized by [the United States' experts] in their expert reports as not predominantly sandy, the erosion damage to such property will be analyzed as damage to a cohesive shore." *Id.*

The parties are now engaged in fact and expert discovery in preparation for the dam-

ages phase of litigation. On September 14, 2009, the court entered an expert discovery order establishing the dates for the parties' disclosures of shoreline composition experts, high water mark experts, and shore protection and other damages issues. *See* Order of Sept. 14, 2009, Dkt. No. 328. On November 2, 2009, plaintiffs disclosed the report of their shoreline expert, Dr. Scudder Mackey (Mackey Report or Mackey Rpt.). Pls.' McNinch Mot. 2. On November 25, 2009, defendant moved the court for an extension of time to disclose its shoreline composition experts. *See* Defendant's Motion for an Enlargement of Time filed Nov. 25, 2009, Dkt. No. 370. On November 30, 2009, the court granted defendant an extension of time until December 11, 2009 to disclose its shoreline composition experts. *See* Order of Nov. 30, 2009, Dkt. No. 371. On December 10, 2009, defendant provided plaintiffs with the names and reports of its three shoreline composition experts—Dr. Jesse E. McNinch, Dr. David M. Mickelson and Dr. Robert B. Nairn. *See* Pls.' McNinch Mot. 3, Exhibits (Exs.) B–D.[3] Plaintiffs move the court to strike the reports prepared by Dr. McNinch (McNinch Report or McNinch Rpt.), Pls.' McNinch Mot. 1–2, and Dr. Nairn (Nairn Report or Nairn Rpt.), Pls.' Nairn Mot. 1–2.

Plaintiffs argue that the McNinch Report should be struck because it violates Rule 37(c) of the Rules of the United States Court of Federal Claims (RCFC) and Rules 403 and 702 of the Federal Rules of Evidence (FRE). Pls.' McNinch Mot. 1–2. Plaintiffs allege that Dr. McNinch does not articulate the scientific reasoning behind his conclusions. *Id.* at 2. In particular, plaintiffs argue that the McNinch Report neither provides a history and critique of sidescan sonar nor includes references that provide this information. *Id.* at 6. Further, plaintiffs claim that Dr. McNinch's criticism of the Coastal

---

**2.** "Section 111 authorizes the Secretary of the Army 'to investigate, study, and construct projects for the prevention or mitigation of shore damages attributable to Federal navigation works.'" *Banks II*, 314 F.3d at 1306 (quoting River and Harbor Act of 1968, Pub.L. No. 90–483, § 111, 82 Stat. 731, 735 (1970)).

**3.** Dr. Jesse McNinch's Report, Dr. David Mickelson's Report and Dr. Robert Nairn's Report (the Reports) are attached to Plaintiffs' Motion to

Strike Defendant's Expert, Dr. Jesse McNinch (Pls.' McNinch Mot.) as Exhibits B, C and D respectively. The reports will be cited as the McNinch Report (McNinch Rpt.), the Mickelson Report (Mickelson Rpt.) and the Nairn Report (Nairn Rpt.). All page citations refer to the page numbers of the exhibits as they appear on the electronic docket for the case, Docket Number 99–4451.

Engineering Manual (CEM)[4] is unsubstantiated by reference to authorities. *Id.* In the alternative, plaintiffs argue that the McNinch Report should be struck because it is unnecessary and repetitive of the reports of plaintiffs' other experts, Dr. Nairn and Dr. Mickelson. *Id.* at 9–10.

Plaintiffs argue that the Nairn Report should be struck because it violates RCFC 26(a)(2), RCFC 37(c) and FRE 702. Pls.' Nairn Mot. 1–2. Specifically, plaintiffs seek to exclude three parts of the Nairn Report: Section 3 of the Nairn Report regarding sediment budget revisions because it violates the law of the case doctrine and includes statements unsupported by scientific data; portions of Section 2 of the Nairn Report that redefine the term "cohesive shore" in violation, plaintiffs argue, of the standards set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 591–95, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); and portions of Section 2 in which, plaintiffs argue, Dr. Nairn creates a new shoreline category of "predominately sandy." Pls.' Nairn Mot. 6, 12–13, 18. In its response, defendant contends that plaintiffs' McNinch Motion and plaintiffs' Nairn Motion are improper and procedurally premature. Def.'s Resp. McNinch Mot. 1 n. 1. The court, however, treats plaintiffs' Motions as motions in limine intended to promote the efficiency of expert discovery in compliance with RCFC 26. *See Reese v. Herbert*, 527 F.3d 1253, 1266 (11th Cir.2008) (" '[T]he expert witness discovery rules are designed to allow both sides in a case to prepare their cases adequately and to prevent surprise' ") (quoting *Cooper v. Southern Co.*, 390 F.3d 695, 728 (11th Cir. 2004)). Because the court does not find persuasive defendant's argument that the Motions are premature, the court examines the Motions on the merits.

II. Discussion

 A. The Admissibility of Expert Testimony Generally

 █ FRE 702 governs the admissibility of expert testimony:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702. The United States Supreme Court has described the trial court as a "gatekeeper" under FRE 702, with the duty to " 'ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.' " *Kumho Tire Co. v. Carmichael* (*Kumho Tire*), 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (quoting *Daubert*, 509 U.S. at 597, 113 S.Ct. 2786). The trial court's gatekeeping duties include assessment of scientific, technical or any other type of expert testimony. *Id.* at 147, 119 S.Ct. 1167. The underlying rationale for the gatekeeping requirement is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152, 119 S.Ct. 1167.

█ In *Daubert*, the Supreme Court established a two-prong test for the admissibility of expert evidence. First, a trial court examines the reliability of the underlying principles and methodologies. *Daubert*, 509 U.S. at 592–93, 113 S.Ct. 2786. Under the first prong, the trial court considers: whether the methodologies can be and have been tested; whether the theories have been peer-reviewed and published; any known or potential rate of error; and acceptance of the methodologies within the relevant scientific or technical community. *Id.* at 593–94. In *Kumho Tire*, the Supreme Court encouraged

---

4. The Coastal Engineering Manual is "[a] manual published by the United States Army Corps of Engineers in which [d]efendant's shoreline composition expert, Dr. Robert Nairn, authored a chapter describing the six criteria for identifying cohesive shorelines." Pls.' McNinch Mot. 6 n. 1 (citing Exhibit (Ex.) D 11).

the trial court to consider other aspects of the expert's report in order to determine admissibility. 526 U.S. at 151, 119 S.Ct. 1167 ("[In *Daubert,* the Supreme Court] made clear that its list of factors was meant to be helpful, not definitive."). "The trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Id.* at 152, 119 S.Ct. 1167. The second prong discussed in *Daubert* is whether testimony is relevant to the facts at issue. *Daubert,* 509 U.S. at 591–92, 113 S.Ct. 2786 ("[T]he evidence or testimony [must] 'assist the trier of fact to understand the evidence or to determine a fact in issue.' ") (quoting Fed.R.Evid. 702). The Court concluded that "relevance" requires that a "fit" exist between the proffered testimony and the issue up for consideration and resolution at trial. *Id.* ("[The relevance] standard requires a valid scientific connection to the pertinent inquiry."). And, as with other testimony, even expert testimony which is relevant and reliable may be challenged under FRE 403, which permits the exclusion of evidence on grounds of prejudice, confusion or waste of time. *See* Fed.R.Evid. 403.

■■■ The introduction of expert testimony may also be barred under the court's procedural rules. RCFC 26(a)(2)(B) specifies that an expert's testimony must be accompanied by a written report that discloses, among other information, "the basis and reasons for [the opinions]; the data or other information considered by the witness in forming [the opinions]; [and] any exhibits that will be used to summarize or support [the opinions]." RCFC 26(a)(2)(B). If a party does not comply with the provisions outlined in RCFC 26(a)(2)(B), any other party may move to compel and seek appropriate sanctions pursuant to RCFC 37(a)(3)(A). RCFC 37(a)(3)(A) ("If a party fails to make a disclosure required by RCFC 26(a), any other party may move to compel disclosure and for appropriate sanctions."); RCFC 37(c)(1) ("If a party fails to provide information or identify a witness as required by RCFC 26(a) or (e), the party is not allowed to use [the withheld] information or witness to supply evidence on a motion, at a hearing, or at a trial unless the failure was substantially jus-

tified or is harmless."). " 'The burden of establishing that a failure to disclose was substantially justified or harmless rests on the nondisclosing party.' " *Mitchell v. Ford Motor Co.,* 318 Fed.Appx. 821, 824 (11th Cir. 2009) (unpublished decision) (quoting *Leathers v. Pfizer, Inc.,* 233 F.R.D. 687, 697 (N.D.Ga.2006)). If the court finds that a party has failed to comply with Rule 26, the court may strike an expert's testimony. *See Smith v. Botsford Gen. Hosp.,* 419 F.3d 513, 516–17 (6th Cir.2005) (holding that the trial court was within its discretion when the trial court struck an expert's testimony because the expert failed to disclose information required under Rule 26 in a timely manner).

**B. The McNinch Report**

**1. Whether Dr. McNinch Qualifies as an Expert**

Plaintiffs seek to strike the McNinch Report as violating RCFC 26(a)(2)(B). Pls.' McNinch Mot. 7–8. Although plaintiffs do not directly challenge Dr. McNinch's qualifications as an expert, they do so in substance by questioning parts of his report arguing that he "does not explain ... his professional background or experience regarding sidescan sonar" and provides "conclusory statements, without citation or reference to the data used to support his opinions." Pls.' McNinch Mot. 6. In order to determine the admissibility of the McNinch Report under FRCP 702, the court must first determine whether Dr. McNinch qualifies as an expert.

■■■ FRE 702 states that a witness may be qualified as an expert "by knowledge, skill, experience, training, or education." Fed.R.Evid. 702. Dr. McNinch's curriculum vitae, attached to his expert report, McNinch Rpt. 10–25, provides the following information relevant to his qualifications: with regard to education, Dr. McNinch holds three academic degrees including a doctorate in Marine Sciences from the University of North Carolina at Chapel Hill, *id.* at 10; with regard to experience, Dr. McNinch has worked in the field of marine sciences for the past thirteen years and has held many different academic and research positions, *see id.,* in particular, he has worked throughout the

United States conducting research and monitoring projects in the fields of bathymetry, oceanographic conditions, morphodynamics and geological frameworks, *see id.* at 11–12; and with regard to scholarship, Dr. McNinch has published over ninety research publications on topics such as "geology metrics for predicting shoreline change" and "shoreline dynamics," *id.* at 13–25. Dr. McNinch is now employed as the Director of the Field Research Facility of the United States Army Corps of Engineers Coastal and Hydraulics Laboratory located in Duck, North Carolina. *Id.* at 10. The McNinch Report does not indicate that Dr. McNinch has been qualified as an expert in a federal or other trial.

Based upon Dr. McNinch's curriculum vitae, the court concludes that defendant has made a showing that Dr. McNinch is an expert in sidescan sonar interpretation sufficient to defeat a motion in limine to strike his report on the basis that Dr. McNinch is without expertise. Of course, plaintiffs may further address Dr. McNinch's qualifications as an expert in voir dire at trial.

 Plaintiffs also assert that the McNinch Report is deficient in light of RCFC 26(a)(2)(B) [5] because it does not provide a "complete statement of all opinions . . . and the basis and reasons for them," RCFC 26(a)(2)(B)(i), nor does it provide all of the "data or other information considered by the witness in forming [his opinions]," RCFC 26(a)(2)(B)(ii); *see* Pls.' McNinch Mot. 6–7. Plaintiffs are focused on two matters affecting the reliability of Dr. McNinch's opinion: the reliability of sidescan sonar as a tool to identify cohesive shoreline and Dr. McNinch's use of the six criteria described in the Coastal Engineering Manual for identifying cohesive shorelines. *Id.* at 6. In particular, plaintiffs allege that the McNinch Report fails to provide a history and critique of the use of sidescan sonar and that the Report provides no basis for Dr. McNinch's opinions. *Id.*

The court examines plaintiffs' challenge to the reliability of The McNinch Report in light of the guidance provided by the Supreme Court in *Daubert.* *See Daubert,* 509 U.S. at 593–94, 113 S.Ct. 2786. Plaintiffs assert that Dr. McNinch "offers nothing more than conclusory statements, without citation or reference to the data used to support his opinions" and asks the court to strike his entire report "because it is based upon broad, subjective, conclusory opinions, which are devoid of any scientifically supported reason or data, in violation of Rule 26(a)(2)." Pls.' McNinch Mot. 6–7. The court disagrees.

In Section 1 of his report Dr. McNinch provides a general historical background on the use of sidescan sonar including recent technological developments in the field. McNinch Rpt. 1–2. Also, Dr. McNinch's curriculum vitae, *id.* at 13, indicates that Dr. McNinch's current position as well as his numerous research projects with the United States Geological Survey, United States Army Corps of Engineers and other organizations surveying and coring seabed and mapping shipwrecks would have likely included use of the sidescan sonar technique, which has been "widely used in the oceanographic community for several decades and is generally accepted as an excellent tool for mapping features resting on the seafloor and for measuring the acoustic response . . . of the seafloor (lakebed)," *id.* at 1. Section 1 of the McNinch Report clearly outlines the way in which sidescan sonar is typically used to map the lakebed and to determine the "distribution of various geological substrates." *Id.* at 2. Dr. McNinch discusses both recent technological developments and problems associated with the interpretation of sidescan sonar data. *Id.* Dr. McNinch also provides citations to the works he consulted in preparing his report including citations to Dr. Mackey's work and expert report. *See id.* at 1, 8–9.

 There is also a notable similarity in content between the McNinch Report and the report of plaintiffs' expert Dr. Mackey in regard to background information. *Compare*

5. Plaintiffs do not cite the specific subsection of Rule 26(a)(2)(B) of the Rules of the United States Court of Federal Claims (RCFC) which they claim defendant has violated. *See* Pls.' McNinch

Mot. 2, 6–7. The court infers from the terms of plaintiffs' argument that plaintiffs are alleging a violation of RCFC 26(a)(2)(B)(i) and 26(a)(2)(B)(ii).

McNinch Rpt. 2 (explaining that sidescan sonar "is typically used to map the distribution of various geological substrates and/or biology living on the lakebed surface ... because these different surfaces often generate characteristics and distinguishable changes to the reflected sound") with Def.'s Resp. McNinch Mot., Ex. 1 (Mackey Report) 2 ("Generally, harder materials (bedrock, sand, metal) will give a stronger acoustic return than softer materials (silt, clay, or mud)."). The court notes that citation to authority for every statement in a report is not necessary in order for an expert to comply with RCFC 26(a)(2)(B)(i). RCFC 26(a)(2)(B)(i) requires that an expert report must contain: "a complete statement of all opinions the witness will express and the basis and reasons for them." RCFC 26(a)(2)(B)(i).

 Plaintiffs' argument regarding Dr. McNinch's failure to comply with RCFC 26(a)(2)(B)(i) is based largely on *Elder v. Tanner*, 205 F.R.D. 190 (E.D.Tex.2001). *See* Pls.' McNinch Mot. 7–8. Elder, a case dealing with patent infringement, provides an unconvincing parallel with plaintiffs' case because the Elder court found that the expert reports at issue contained "conclusory opinions that do not comply with the requirements established in [Federal Rule of Civil Procedure (FRCP) 26(a)(2)(B) ]." [6] *Elder*, 205 F.R.D. at 193. The Elder opinion cites to specific excerpts of the expert reports which discuss highly case-specific information. *Id.* at 192–93. Plaintiffs simply do not point to specific deficiencies in the McNinch Report which could be viewed as closely analogous to the very specific deficiencies identified by the Elder court's treatment of the interpretation of patents. The court agrees with the general approach of the Elder court that "[t]he expert reports must contain some discussion of their reasoning and thought process that lead[s] to their ultimate opinions." *Id.* at 193; *see also* RCFC 26(a)(2)(B)(i); FRCP 26(a)(2)(B)(i). However, as stated by the Supreme Court in

*Kumho Tire*, the court has "discretionary authority ... to avoid unnecessary 'reliability' proceedings in ordinary cases where the reliability of an expert's methods is properly taken for granted." *Kumho Tire*, 526 U.S. at 152, 119 S.Ct. 1167. Plaintiffs are correct in their argument, Pls.' McNinch Mot. 8, that a court cannot properly rely exclusively on an expert's own assurance of the validity of his opinions as an expert under FRE 702. *See Gen. Elec. Co. v. Joiner (Joiner)*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit*[7] of the expert"). In this case, however, the court finds that Dr. McNinch's explanation of his conclusions, supported by his education and employment records, provides "more than 'the expert's bald assurance of validity.' " Pls.' McNinch Mot. 8 (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d at 1311, 1316 (9th Cir.1995)) (on remand). The court finds that Dr. McNinch has provided sufficient "basis and reasons" for his opinions to defeat a motion in limine to strike his Report. *See* RCFC 26(a)(2)(B)(i).

2. Whether Dr. McNinch's Treatment of the Corps' Coastal Engineering Manual Is Proper

Plaintiffs' second challenge is based on Section 2 of the McNinch Report. *See* Pls.' McNinch Mot. 9. Section 2 of The McNinch Report addresses the Corps' Coastal Engineering Manual for identifying cohesive shorelines and states:

The only cohesive sediment samples documented were collected from the beach as clasts (chunks) that likely were transported by waves and currents from an exposed layer somewhere offshore during a storm.

McNinch Rpt. 3. Plaintiffs argue that Dr. McNinch "offers no reason, logic, or data for his assumption that the cohesive sediment samples were transported by waves and cur-

---

6. Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure is identical in form to RCFC 26(a)(2)(B). Fed.R.Civ.P. 26(a)(2)(B); RCFC 26(a)(2)(B).

7. *Ipse dixit* is Latin for "he himself said it." *Black's Law Dictionary* 847 (8th ed.2004). The term means "[s]omething asserted but not proved." *Id.*

rents during a storm." Pls.' McNinch Mot. 9. Plaintiffs also state that Dr. McNinch contradicts "the Army Corp[s'] own position[ ] as authored by Dr. Nairn" because he "opines that using the six criteria described in the Corp[s'] Coastal Engineering Manual for identifying cohesive shorelines is 'misleading,' when only one of the six [categories] actually addresses what type of sediment is widely exposed near the shoreline and thus could potentially exert some level of constraint on the volume of sand on the beach." *Id.* (quoting McNinch Rpt. 6). Plaintiffs argue that Section 2 of the McNinch Report should be struck because he fails to provide "scientific data or reasoning" to support his "baseless, subjective opinions." *Id.*

The court disagrees with plaintiffs' characterization of the McNinch Report. It appears to the court that plaintiffs are arguing facts rather than the law. Instead of making an argument that Section 2 of the McNinch Report does not comply with the requirements for the admissibility of expert reports set forth in RCFC 26(a)(2)(B)(i), plaintiffs appear to be arguing that Dr. McNinch's findings are inaccurate and/or inconsistent with those of another of defendant's experts, Dr. Nairn. As this court decided in a prior phase of this case, arguments based on fact should be presented during trial when the parties "will have a full opportunity to explore the credibility (including the consistency of viewpoints)" of the witness. *Banks v. United States (Banks III)*, 75 Fed.Cl. 294, 301 (2007). Plaintiffs will have the opportunity to address their concerns about the factual basis for the McNinch Report and possible conflicts between the McNinch Report and the Nairn Report at trial.

### 3. Whether the McNinch Report Should Be Excluded as Cumulative Under FRE 403

Plaintiffs argue that the McNinch Report should be excluded on grounds that it is cumulative. Pls.' McNinch Mot. 9. Plaintiffs argue that, because defendant has retained three experts on shoreline composition, to respond to plaintiffs' lone expert on shoreline composition, defendant's experts are cumulative. *Id.* Plaintiffs further argue that defendant's three experts do not present "new or

different information from the other, resulting in a needless waste of time and litigation resources." *Id.* at 10. Plaintiffs suggest that the three experts, Dr. McNinch, Dr. Nairn and Dr. Mickelson, are duplicative and intended to "bolster" one another's opinions. *Id.* at 9–10. Plaintiffs also argue that "a review of The McNinch Report reveals that he reaches the same opinions and conclusions as those set forth in Dr. Nairn's and Dr. Mickelson's expert reports." *Id.* at 10.

FRE 403 guides a trial court to exclude relevant evidence "if its probative value is substantially outweighed by . . . considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed.R.Evid. 403; *see also United States v. Colomb*, 419 F.3d 292, 303 (5th Cir.2005). The trial court is permitted to exclude testimony that is repetitious of evidence already introduced. *Consol. Grain & Barge Co. v. Marcona Conveyor Corp.*, 716 F.2d 1077, 1083 (5th Cir.1983). However, the exclusion of evidence under FRE 403 "is an extraordinary remedy which should be used only sparingly since it permits the trial court to exclude concededly probative evidence." *United States v. Merrill*, 513 F.3d 1293, 1301 (11th Cir.2008) (internal quotation marks omitted); *see also Global Computer Enters. v. United States*, 88 Fed.Cl. 52, 71 (2009) (stating that when " 'reviewing issues under [FRE] 403, [the court] look[s] at the evidence in a light most favorable to its admission, maximizing its probative value and minimizing its undue prejudicial impact' " (quoting *United States v. Brown*, 441 F.3d 1330, 1362 (11th Cir.2006))).

Plaintiffs rely on *Geico Casualty Co. v. Beauford (Geico)*, No. 8:05-cv-697-T-24EAJ, 2007 WL 2412974, 2007 U.S. Dist. LEXIS 61379 (M.D.Fla. Aug. 21, 2007) and *Washington v. Greenfield*, No. 86-930, 1986 WL 15758, 1986 U.S. Dist. LEXIS 19037 (D.D.C. Oct. 15, 1986) in support of their argument that the McNinch Report is duplicative and should be excluded. Pls.' McNinch Mot. 10–11. In *Geico*, the court disallowed the testimony of one of three insurance industry experts put forward by defendants because the testimony that they sought to offer appeared

to the court to be cumulative. *Geico,* 2007 WL 2412974, *4, 2007 U.S. Dist. LEXIS 61379, at *11–12 ("[B]ecause [two of the experts] are insurance industry experts, and because the[ir] testimony . . . appear[s] to be cumulative, one of the insurance industry experts should be precluded from testifying."). In *Washington,* the court found that the testimony of four gynecological experts would have been "unnecessarily cumulative." *Washington,* 1986 WL 15758, *1–2, 1986 U.S. Dist. LEXIS 19037, at *4. The court compared the testimony of each of the doctors and excluded two of the four because their testimony was deemed to be within the expertise of one of the other two experts. *Id.,* 1986 WL 15758, *1–2, 1986 U.S. Dist. LEXIS 19037, at *3–4 ("[A]ll four expert witnesses would indeed present cumulative, unnecessary evidence at trial."). However, the *Washington* court distinguished its decision from a case that appears more readily applicable to this matter, *Johnson v. United States,* 780 F.2d 902 (11th Cir.1986). *See Washington,* 1986 WL 15758, *1–2, 1986 U.S. Dist. LEXIS 19037, at *3–4. In *Johnson,* the United States Court of Appeals for the Eleventh Circuit (Eleventh Circuit) held that the trial court had abused its discretion when it excluded the expert testimony of Dr. Rauber in a medical malpractice case because his testimony was considered duplicative in light of the fact that two other doctors who practiced at the same hospital were testifying. 780 F.2d at 904–06. Upon reviewing Dr. Rauber's qualifications and what testimony he would have given had his testimony been admitted by the trial court, the Eleventh Circuit decided that his testimony should have been admitted because it "would have been based in part on evidence not relied upon by the other experts." *Id.* at 906. The Eleventh Circuit directed the trial court to consider Dr. Rauber's testimony in reconsidering its decision as to liability despite the fact that his analysis included some evidence and analysis used by the other experts because it would be "somewhat different" from the other experts' testimony and "therefore, at least partially non-cumulative." *Id.*

Like Dr. Rauber, Dr. McNinch relies on some evidence that will also be relied on by other experts in this case, but may come to that evidence with a different perspective that is potentially helpful to the court. Defendant's three experts have unique educational backgrounds: Dr. McNinch is proffered as an expert in "coastal geophysics and geology," Dr. Mickelson is proffered as an expert in "geomorphology" and Dr. Nairn is proffered as an expert in "coastal engineering, shore protection, coastal processes, erosion of cohesive and sandy shores, and beach nourishment." *See* Def.'s Resp. McNinch Mot. 13–14. Plaintiffs are correct to point out that there is a certain amount of "overlap" among the three reports. The mere presence of overlap, reference to another expert's report or a similar conclusion, however, does not render an expert report unnecessarily "cumulative" pursuant to FRE 403. *See* Pls.' McNinch Mot. 11 ("Dr. Nairn's [R]eport frequently references Dr. Mickelson's [Report] and Dr. McNinch's [R]eport[ ] to further establish support for his opinions and conclusions."). An expert's use of another expert's report does not necessarily render his report cumulative. The court is not persuaded that plaintiffs' motion in limine to strike on the basis of FRE 403 should be granted. For the foregoing reasons, Plaintiffs' Motion to Strike Defendant's Expert, Dr. Jesse McNinch is DENIED.

### C. The Nairn Report [8]

#### 1. Section 3 of the Nairn Report

##### a. Law of the Case Doctrine

Plaintiffs argue that the court should strike Section 3 of the Nairn Report regarding sediment budget revisions because the opinions expressed in Section 3 violate the law of the case doctrine and are a "clear attempt to re-litigate this [c]ourt's prior ruling that trucked-in sediment was not effective beach nourishment." Pls.' Nairn Mot. 6–7. In response, defendant argues that Dr.

---

8. Plaintiffs attempted to challenge Dr. Nairn's credibility as an expert and the content of his report at a prior stage of the case. *See Banks v.*

*United States (Banks III),* 75 Fed.Cl. 294, 297 (2007).

Nairn has appropriately revised his earlier sediment budget to incorporate the court's holding during the liability phase of the case. Def.'s Resp. Nairn Mot. 20.

The law of the case doctrine, "[a]s most commonly defined, ... posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800, 815–16, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988) (internal quotation marks omitted). "Under this doctrine, findings of fact reviewed in and relied upon in an appellate court's decision become the law of the case and, absent certain exceptional circumstances, may not be disturbed by a trial court on remand." *State Indus., Inc., v. Mor–Flo Indus., Inc.,* 948 F.2d 1573, 1576 (Fed.Cir.1991). However, as a trial court ruling on a subject as to which it has not received direction by an appellate decision, this court is within its power to revise its prior determinations. *See United States v. Houser,* 804 F.2d 565, 567 (9th Cir.1986) ("The legal effect of the doctrine of the law of the case depends upon whether the earlier ruling was made by a trial court or an appellate court. All rulings of a trial court are 'subject to revision at any time before the entry of judgment.' A trial court may not, however, reconsider a question decided by an appellate court." (quoting Fed.R.Civ.P. 54(b))).

In identifying Dr. Nairn's violation of the law of the case doctrine, plaintiffs point to the decision in *Banks V* in which the court ruled that "coarse material, usually trucked in from outside of the littoral system, is not effective mitigation." 78 Fed.Cl. at 656; *see* Pls.' Nairn Mot. 6. Plaintiffs argue that by presenting a revised sediment budget, Dr. Nairn is attempting to reopen the issue of whether trucked-in beach nourishment was effective mitigation. Pls.' Nairn Mot. 6–7. In his report, Dr. Nairn states: "As noted in Section 3. 1, on a purely technical basis and in the opinion of this expert, the trucked in sediment is 100% effective as compensating beach nourishment." Nairn Rpt. 26. While the court warned against relitigation of an issue that has already been decided

in *Banks III,* the court does not interpret the Nairn Report as an attempt to relitigate the issue of effectiveness of beach nourishment. *See* Pls.' Nairn Mot. 8 (referencing *Banks V,* 78 Fed.Cl. at 654). Instead, the court finds that Dr. Nairn incorporates the court's rulings on sediment budget revisions in the liability phase of this case—namely, the court's finding that "the nourishment program needs to provide sediment that has the same physical characteristics as the shore that is to be nourished." *Banks V,* 78 Fed. Cl. at 630 (internal quotation marks omitted); *see* Nairn Rpt. 1, 3, 19.

Although it is not possible to determine with certainty whether defendant is requesting that the court reconsider its finding related to beach nourishment, *see* Pls.' Nairn Mot. 8; Def.'s Resp. Nairn Mot. 8, the law of the case doctrine would not prevent defendant from asking for reconsideration nor does it prohibit a court from reviewing support for that request. The court does not interpret the law of the case doctrine as grounds upon which to strike the Nairn Report. Because there has been no final judgment issued in this case, statements contained in a previous opinion of this court in this case do not preclude the court from considering the issues raised in the Nairn Report nor require that the Report be struck. Cf. *Banks v. United States (Banks IV),* 76 Fed Cl. 686, 690–91 (2007) (explaining that the law of the case precludes the United States Court of Federal Claims (Court of Federal Claims) from revisiting issues that the Federal Circuit has previously decided in an earlier stage of the same litigation).

b. Dr. Nairn's Statements Are Supported by Scientific Data

In the alternative, plaintiffs argue that Section 3 of the Nairn Report violates RCFC 26(a) and FRE 702 because "the statements, conclusions, and opinions espoused in Section 3 are not supported by reason, data or science" and because "Dr. Nairn's scientific methodology ... lacks reliability." Pls. Nairn Mot. 10–11. Plaintiffs point out several areas in which Dr. Nairn allegedly makes "unsupported, conclusory statements [in support of the argument] that trucked-in sedi-

ment should be considered effective beach nourishment." Pls.' Nairn Mot. 10. In particular, plaintiffs argue that the court cannot admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. Pls.' Nairn Mot. 11 (citing *Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla.* (*Cook*), 402 F.3d 1092, 1111 (11th Cir.2005)).

█ When the admissibility of an expert's findings are challenged, the court begins by considering the qualifications of the expert. *See Banks III*, 75 Fed.Cl. at 299–300. In its opinion following the trial on liability, the court acknowledged Dr. Nairn's credentials and his extensive coastal engineering experience. *Id.* at 302. Plaintiffs' liability trial expert, Dr. Meadows, also endorsed Dr. Nairn's experience. *Id.* ("Dr. Meadows ... stated that Dr. Nairn 'probably is the top modeler in the Great Lakes region', and that he could not 'think offhand of anyone in the near shore sediment dynamics area who has done more or accomplished more.'"). Further, Dr. Nairn's curriculum vitae, Nairn Rpt. 18–33, demonstrates Dr. Nairn's expertise in a number of areas pertinent to Section 3 of his report including "Coastal Processes and Engineering." *See id.* at 18.

█ Plaintiffs' first criticism of the Nairn Report is Dr. Nairn's statement that "[t]here are several ways to determine the upper cut off of effective grain size for beach nourishment." Pls.' Nairn Mot. 10 (internal quotation marks omitted). Plaintiffs argue that "Dr. Nairn provides no support or data for his conclusion that there are several ways to determine the upper cut off of effective grain size for beach nourishment." *Id.* However, the Nairn Report identifies several methods to determine the upper cut off of effective grain size and describes each of the methods in detail. Nairn Rpt. 20–21. In particular, Dr. Nairn identifies the various classification systems that he consulted in compiling the methods for determining the upper cut off of effective grain size for beach nourishment as the Wentworth classification

and the American Society for Testing and Materials (ASTM) International standard. *Id.* at 20. Dr. Nairn also cites the Mickelson Report as well as the CEM as background references for his conclusion that there are "several ways to determine the upper cut off of effective grain size for beach nourishment." *Id.* at 20–21. The Nairn Report provides sufficient background in support of his statements regarding the upper cut off of effective grain size for beach nourishment to defeat a motion in limine to strike on the basis of lack of support. The court finds that the Nairn Report amounts to more than an "'expert's bald assurance of validity'" as argued by plaintiffs. *See* Pls.' Nairn Mot. 11 (quoting *Daubert*, 43 F.3d at 1316).

Plaintiffs' second criticism of Section 3 of the Nairn Report is that Dr. Nairn does not offer logic or reasoning for his statement: "'Although there is no way of telling for certain, the presence of significant quantities of gravel on the beach and shallow nearshore most likely points to this being naturally derived.'" Pls.' Nairn Mot. 10 (citing Nairn Rpt. 20).[9] The text of the Nairn Report following the text quoted in plaintiffs' Motion discusses Dr. Mickelson's stratigraphic work and Dr. Nairn's observation that "the last trucked sand nourishment was 11 years ago in 1998." Nairn Rpt. 20–21. Based on this citation, the court finds that the Nairn Report contains information indicating a basis sufficient to defeat a motion in limine to strike on the basis that Dr. Nairn fails to provide logic or reasoning for his statements regarding gravel on the beach and shallow nearshore.

Plaintiff's third criticism is of Dr. Nairn's statement: "In my experience, most sandy beaches on the Great Lakes feature a significant gravel size fraction." Pls.' Nairn Mot. 10. Plaintiffs claim that Dr. Nairn "fails to provide any information as to what in his experience on the Great Lakes leads him to his conclusions." *Id.* at 11. In response, defendant cites Dr. Nairn's "extensive experience studying sediment dynamics and

---

9. On the court's electronic docket, page 20 of the Nairn Report is page 23 of Ex. B–1, filed January 22, 2010, Dkt. No. 384.

working as a coastal engineer in the Great Lakes region" as support for his observations about the Great Lakes. Def.'s Resp. Nairn Mot. 12. Plaintiffs contend that the Nairn Report relies only on Dr. Nairn's own assertions, the "*ipse dixit* of the expert." Pls.' Nairn Mot. 11 (citing *Cook*, 402 F.3d at 1111) (emphasis added). However, the court finds that Dr. Nairn has provided sufficient references in support of his statements to defeat a motion in limine to strike. To the extent plaintiffs disagree with Dr. Nairn's conclusions they will have an opportunity at trial to challenge both their reliability and support.

Plaintiffs' fourth criticism of Section 3 of the Nairn Report is his alleged lack of support for his revised sediment budget. Plaintiffs claim that the revised sediment budget "lacks reliability because it fails to consider relevant facts of this particular case." Pls.' Nairn Mot. 11. Specifically, plaintiffs complain that: Dr. Nairn does not consider the time period before 1970 despite the court's finding that "[i]t is undisputed that defendant failed to mitigate for any erosion prior to the early 1970s," *Banks V*, 78 Fed.Cl. at 654, that Dr. Nairn fails to consider "the massive amounts of material being dredged from the inner St. Joseph Harbor and placed outside the littoral zone at the South West Michigan airport and elsewhere," and that Dr. Nairn does not provide support for his "assum[ption] that mitigation can be viewed as an average, rather than on a year to year basis." Pls.' Nairn Mot. 11–12.

The court finds that plaintiffs' fourth criticism of the Nairn Report provides insufficient support for a motion in limine to strike. Plaintiffs' arguments regarding Dr. Nairn's revised sediment budget are largely based on differences of opinion regarding facts rather than law. At trial, plaintiffs "will have a full opportunity to explore the credibility (including the consistency of viewpoints) of Dr. Nairn and other witnesses and the reliability of particular conclusions supported in the parties' expert reports." *Banks III*, 75 Fed. Cl. at 301 (stating that plaintiffs are inappropriately arguing facts and not law); *see also Liquid Dynamics Corp. v. Vaughan Co.*, 449 F.3d 1209, 1221 (Fed.Cir.2006) (stating that an expert's alleged use of incorrect data, or

allegations that the expert was missing data, were properly considered as part of the weight of the evidence, rather than the admissibility of the evidence). In the alternative, plaintiffs request that, should the court find that Dr. Nairn's revised sediment budget is admissible, the court grant plaintiffs leave to file a motion to reconsider the entirety of Dr. Nairn's sediment budget analysis. Pls.' Nairn Mot. 10 (stating that plaintiffs would file a motion to reconsider partly based on the assertion "previously accepted by the [c]ourt, that the net littoral drift is only one-half of what the government's own scientists ... had said it was"). If plaintiffs are requesting direction from the court to file a further motion, the court declines to request that a further motion be filed.

### 2. Section 2 of the Nairn Report

### a. Cohesive Shore

Plaintiffs also argue that the court should strike Section 2 of the Nairn Report because he has attempted to redefine "cohesive shore" and because "Section 2 of Dr. Nairn's Report lacks scientific support and it fails to meet reliability standards set forth in *Daubert*." Pls.' Nairn Mot. 12–13. Plaintiffs appear to be invoking three of the *Daubert* factors, *See Daubert*, 509 U.S. at 593–94, 113 S.Ct. 2786, to challenge the reliability of Section 2 of the Nairn Report pertaining to "cohesive shore." *See* Pls.' Nairn Mot. 12, 17. Specifically, plaintiffs allege that there are no facts to support the Nairn Report, that it has not been peer reviewed and that it has not gained acceptance in the appropriate scientific community. *See id.*

Plaintiffs first argue that Dr. Nairn created a "new" litigation position within Section 2 by defining cohesive shore as " 'having less than 10 to 30% sand content (with one location featuring 36% sand) in the eroding bluff and nearshore sediment.' " *Id.* at 12–13 (quoting Nairn Rpt. 15). In particular, plaintiffs appear to assert that Dr. Nairn has failed to meet the *Daubert* requirement necessitating scientific testing because "the scientific data does not, either explicitly or implicitly, support and define 'cohesive shore' as Dr. Nairn now posits it." Pls.' Nairn Mot. 13 (stating that Dr. Nairn's definition of

cohesive shore as one "having less than 10 to 30% sand content" is unsupported by scientific evidence). Plaintiffs assert that "[i]n none of the data cited by Dr. Nairn is 'cohesive shore' defined as having less than 10 to 30% sand content." *Id.* Plaintiffs contend that the report Dr. Nairn wrote as part of the liability phase of this case (Liability Report) is inconsistent with Dr. Nairn's current definition of "cohesive shore." *Id.* at 16 (stating that Dr. Nairn's Liability Report "does not provide a sand percentage to define 'sandy shore' "). Plaintiffs point out that the CEM chapter authored by Dr. Nairn does not include a specific sand percentage in its "observational clues" for a cohesive shore. *Id.* at 16–17. In response, defendant states that "each of the studies that Dr. Nairn references provides examples of cohesive shores with the statistical measurements Dr. Nairn describes" and that plaintiffs conceded as much. Def.'s Nairn Resp. 14 (citing Pls.' Nairn Mot. 14–15). Defendant also notes that plaintiffs even discuss various references that provide "statistical measurements" cited by Dr. Nairn in support of his definition of cohesive shore. *Id.* (referencing Dr. Nairn's citations [10] to Coakley et al., (1986), Kamphius (1987), Skafel & Bishop (1994), and Davidson–Arnott & Langham (2000)). The court declines to conclude that there is an absence of scientific support for Dr. Nairn's definition of cohesive shore sufficient to support a motion to strike under *Daubert.*

■ Plaintiffs also contend that Dr. Nairn's "new litigation definition for 'cohesive shore' " is deficient under *Daubert.* Pls.' Nairn Mot. 17. Plaintiffs argue that his definition "has not undergone the rigors of peer review, and … has not gained acceptance or been relied upon by his colleagues in the coastal engineering community." *Id.* The second factor in the *Daubert* test asks

whether the expert's methodology has been subjected to peer review and publication. *Daubert,* 509 U.S. at 593, 113 S.Ct. 2786. Defendant responds to plaintiffs' allegations regarding lack of peer review by noting that "this [c]ourt has recognized that 'Dr. Nairn's research in cognate areas has been widely published and peer-reviewed.' " Def.'s Resp. Nairn Mot. 17 (quoting *Banks III,* 75 Fed.Cl. at 302). This court has previously held that an expert's report does not need to be published in order to meet the second factor in the *Daubert* test. *Banks III,* 75 Fed.Cl. at 301. As with Dr. Nairn's Liability Report, Dr. Nairn's current report was prepared for the sole purpose of the present litigation. *See id.;* Def.'s Resp. Nairn Mot. 8–9. For this reason, the court would not expect it to be published. *See Banks III,* 75 Fed.Cl. at 301. The fact that a report is unpublished "does not lead to the conclusion that it is not reliable." *Id.* Plaintiffs are free to review and challenge the report during trial, particularly during plaintiffs' cross-examination of Dr. Nairn. *See id.*

■ Plaintiffs also object to Dr. Nairn's citation to studies from Great Lakes other than Lake Michigan, including Lake Erie and Lake Ontario, in support of his definition of "cohesive shore." Pls.' Nairn Mot. 14. Plaintiffs do not directly address *Daubert* in light of this objection. Instead, plaintiffs appear to object to Dr. Nairn's reliance on data from other Great Lakes because defendant argued in discovery that this data was "overly burdensome to produce" in response to plaintiffs' discovery requests. *Id.* (citing Defendant's Response to Plaintiffs' Motion to Compel filed October 2, 2009, Dkt. No. 342–1 at 4, 13). Plaintiffs' argument appears to be based on the assumption that a defendant's position regarding a discovery request limits the research of an expert. It is not clear to

---

10. The following references are fully cited on pages 37 and 39 of the Nairn Report: "Coakley, J.P., Rukavina, N.A. and Zeman, A.J.1986. Wave-induced subaqueous erosion of cohesive tills: preliminary results. Proceedings, Symposium on cohesive shores, May 5–7th, 1986, Burlington[,] Ontario. Associate Committee for Research on Shoreline Erosion and Sedimentation, Natural Research Council of Canada, Ottawa. pp: 120–136" (Coakley et al. (1986)); "Kamphius, J.W.1987. Recession Rate of Glacial Till

Bluffs. Journal of Waterway, Port, Coastal and Ocean Engineering. ASCE, 14(1): 60–73" (Kamphius (1987)); "Skafel, M.G. and Bishop, C.T.1994. Flume experiments on the erosion of till shores by waves. Coastal Engineering, 23: 329–348" (Skafel & Bishop (1994)); "Davidson–Arnott, R.G.D. and Langham, D.R.J.2000. The effects of softening on nearshore erosion of a cohesive shoreline. Marine Geology, 16: 145–162" (Davidson–Arnott & Langham (2000)).

the court that the scope of discovery would limit the facts on which an expert may rely. Dr. Nairn is an expert witness who is, under the Federal Rules of Evidence, entitled to "rely on otherwise inadmissible facts or data '[i]f of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject.'" *Banks III*, 75 Fed.Cl. at 304 (quoting Fed. R.Evid. 703).

Plaintiffs also take issue with the alleged inconsistency of Dr. Nairn's reports over time. Pls.' Nairn Mot. 16 ("In none of Dr. Nairn's prior reports or studies ... has he ever explicitly defined a 'cohesive shore' as less than 10 to 30% sand content."). In response, defendant cites to Dr. Nairn's expert report in which Dr. Nairn relies on a keynote paper he presented in 1997 at the American Shore and Beach Conference in which he notes that "'the sand content of [cohesive shores] is low (usually less than 20%).'" Def.'s Resp. Nairn Mot. 14 (quoting Nairn Rpt. 10–11). Defendant also cites Dr. Nairn's reference to the 1998 CEM, in which Dr. Nairn observed that "the sand and gravel content is low in [cohesive] deposits (often less than 20 percent)," and further stated that "cohesive sediment often consists of 80 to 90 percent fines." Def.'s Resp. Nairn Mot. 14 (internal quotation marks omitted) (citing Nairn Rpt. 11).

Plaintiffs' complaints concerning Section 2 of the Nairn Report are that Dr. Nairn's results are inaccurate, are inconsistent with his prior opinions and misinterpret existing data. *See* Pls.' Nairn Mot. 12–13. It appears to the court that plaintiffs' underlying argument is not that the Nairn Report is unreliable because it is not supported by scientific data or publication but rather that Dr. Nairn's reliance on identified data is misplaced and arguable. The court recognizes an expert's ability to "extrapolate from existing data," including that used by other experts in the field. *See Joiner*, 522 U.S. at 146, 118 S.Ct. 512. Experts commonly rely on material prepared by others to develop their findings and ultimate conclusions. *See Banks III*, 75 Fed.Cl. at 304; *see also United States v. Smith*, 869 F.2d 348, 355 (7th Cir. 1989) ("[I]t is well settled that expert witnesses may rely on material commonly used by others in the field, even if those materials were prepared by others."). Here, plaintiffs disagree with Dr. Nairn's results and believe that the Nairn Report constitutes "manipulate[d] science [that] is unreliable and implausible." Pls.' Nairn Mot. 16. The court does not find a motion in limine an appropriate tool to determine whether Dr. Nairn's findings are more likely true or false. That determination remains to be made on the basis of the trial record.

### b. Dr. Nairn's Use of the Term "Predominantly Sandy"

Plaintiffs argue that Section 2.2 of the Nairn Report should be struck because it creates a new shoreline category described by the term "predominantly sandy." Pls.' Nairn Mot. 18. Section 2.2 of the Nairn Report "provides a summary of the distinguishing factors and processes associated with predominantly sandy and cohesive shores." Nairn Rpt. 15. Plaintiffs assert that Dr. Nairn has improperly created a new shoreline category, "predominantly sandy," that is unsupported by shoreline composition science or data. Pls.' Nairn Mot. 18. Plaintiffs contend that Dr. Nairn's "invention" of the term "predominantly sandy" is part of a "plainly litigation-inspired" effort to create a new shoreline category. *Id.* Further, plaintiffs cite to Dr. Nairn's failure to provide scientific data or support for the "predominantly sandy" category in an effort to "disregard the showing by [p]laintiffs' expert that exposed cohesive glacial till exists on the lakebed throughout [p]laintiffs' zone." *Id.* Plaintiffs contend that Dr. Nairn's use of the term "predominantly sandy" effectively disregards the importance of the "lack of complete sand cover, and the existence of several ... other indicia of a cohesive shore [present in] Dr. Nairn's pre-litigation [report]" thereby overemphasizing the percentage of sand cover in an attempt to "manipulate science to support [defendant's] untenable litigation position." *Id.* at 18–19. Defendant responds that Dr. Nairn's use of the term "is not premised on sand content in isolation, but incorporates a comprehensive and well-developed network of interrelated factors, including the six observational clues articulat-

ed in the CEM." Def.'s Resp. Nairn Mot. 18. Further, defendant argues that Dr. Nairn chose the words "predominantly sandy" as a descriptive term and not as an attempt to define a scientific category. *Id.* at 18–19. Defendant cites to the use of the term "predominantly sandy" in this court's liability opinion. *Id.* (citing *Banks V,* 78 Fed.Cl. at 628, 640 (noting that Dr. Nairn described the shore along plaintiffs' zone as " 'predominantly sandy' ")). The court does not address at this juncture whether Dr. Nairn's use of the phrase "predominantly sandy" is the same as, or even consistent with the court's use of the phrase in its liability opinion. The court expects that the parties will address the possible meanings of the phrase and the particular meaning given it in the Nairn Report in the development of testimony at trial. Plaintiffs present no legal basis upon which the court is required to strike Dr. Nairn's use of the term "predominantly sandy" and the court declines to do so.

III. Conclusion

Based on the foregoing, the court DENIES Plaintiffs' Motion to Strike Defendant's Expert, Dr. Jesse McNinch and Plaintiffs' Motion to Strike Defendant's Expert, Dr. Robert Nairn.

IT IS SO ORDERED.